## IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
## CIVIL ACTION

| | |
|---|---|
| HP PENNSYLVANIA I LLC and<br>HPA BORROWERS 2018-1 MS LLC,<br><br>        Plaintiffs<br>v.<br><br>MAKETA S. JOLLY,<br>        Defendant | COURT OF COMMON PLEAS<br>DELAWARE COUNTY, PA<br><br>CIVIL DIVISION<br>NO. CV-2019-000411 |

### ORDER GRANTING PETITION TO INVALIDATE CDC DECLARATION

AND NOW, this ___ day of May 2021, upon consideration of the Petition for Evidentiary Hearing and to Invalidate CDC Declaration and Proceed with Eviction (the "Petition") filed by Plaintiffs HP Pennsylvania I LLC and HPA Borrower 2018-1 MS LLC ("Plaintiffs") and the response thereto filed by Defendant Maketa Jolly ("Defendant" or "Ms. Jolly"); an evidentiary hearing having been held on April 28, 2021 (the "April 28 Hearing") at which all parties appeared and participated, testimony of witnesses was taken, and certain documents (P-1 through P-9) were admitted into the record; it is hereby **ORDERED** and **DECREED** that the Petition is **GRANTED** as set forth below

This matter originates from a landlord-tenant dispute related to property Ms. Jolly rents from Plaintiffs (the "Property"). In December 2018, a judgment was entered against Ms. Jolly, the tenant, in magisterial district court. She filed a timely appeal to this Court in 2019, which triggered obligations to make supersedeas payments to prevent eviction from the Property during the pendency of her appeal. An Order dated January 23, 2019 memorialized Ms. Jolly's payment obligations, including but not limited to monthly payments of $1,530.00. See Dkt. No. 7.[1] Ms. Jolly's monthly payments in that

---

[1] A subsequent Order, dated October 4, 2019, confirmed these payment obligations. See Dkt. No. 32.

amount commenced, but ceased after December 2019. [P-2]. Ms. Jolly made no payment in January 2020, two payments—of $400 and $600—in February 2020, and one payment of $700 on March 6, 2020. [P-2]. As of the date of this Order, the Office of Judicial Support has not received any additional payments into escrow from Ms. Jolly.

In light of the failure to make required supersedeas payments, the Supersedeas was terminated on September 2, 2020. See Dkt. No. 77.[2] Eviction therefore being permitted, Plaintiffs sought an Order for Possession on that date, but on September 4, 2020, the CDC issued an Order under Section 361 of the Public Health Service Act, 42 U.S.C. 264 and 42 CFR 70.2 (the "CDC Order"), establishing a temporary moratorium on evictions in certain circumstances and under certain conditions.[3] One of these conditions was that a tenant seeking to halt an eviction had to execute, under penalties of perjury, a Declaration ("CDC Declaration") attesting to seven statements as to why the tenant's eviction should be halted. The Declaration states expressly that a tenant is "still required to pay rent and follow all the other terms of [the] lease and rules of the place where [the tenant] live[s]" and that the tenant "may also still be evicted for reasons other than not paying rent or making a housing payment." [P-4] Ms. Jolly signed a CDC Declaration on September 5, 2020 and provided a copy to Plaintiffs. [P-4]

By their Petition, Plaintiffs challenge the truthfulness of the following three statements in Ms. Jolly's CDC Declaration:

[2] The Supersedeas was terminated previously on two prior occasions, in September and December of 2019, also for failure of Ms. Jolly to make monthly payments required by Pa. R. Civ. P. M.D.J. 1008, see Dkt. Nos. 28 & 45, although the striking of the supersedeas in December 2019 was then itself stricken— and therefore the supersedeas reinstated.

[3] The CDC Order was extended several times, including most recently on March 28, 2021, thereby extending the temporary moratorium on evictions, in certain circumstances and under certain conditions, through June 30, 2021. [P-1].

- "I have used <u>best efforts</u> to obtain all available government assistance for rent or housing." (the "<u>Best Efforts Statement</u>") (emphasis added) [P-4 at bullet point 1];

- "I am unable to pay my full rent or make a full housing payment due to substantial loss of household income, loss of compensable hours of work or wages, lay-offs, or extraordinary out-of-pocket medical expenses." (the "<u>Substantial Loss of Income Statement</u>") [P-4 at bullet point 3]; and

- "I am using best efforts to make timely partial payments that are as close to the full payment as the individual's circumstances permit, taking into account other nondiscretionary expenses." (the "<u>Timely Partial Payment Statement</u>") [P-4 at bullet point 4].

At the April 28 Hearing, Ms. Jolly provided testimony with respect to each of the three challenged statements.[4]

The Court finds that Ms. Jolly's testimony at the April 28 Hearing is inconsistent with the Best Efforts Statement, the Substantial Loss of Income Statement, and the Timely Partial Payment Statement on her CDC Declaration. Specifically, Ms. Jolly testified as follows:

- Her efforts to obtain "all available government assistance for rent or housing" consisted of looking at one website on one occasion, from which she learned that her income exceeded the Delaware County threshold to receive assistance.

- She did not know what constitutes "substantial loss of income", and she could not identify the income that she had lost other than to refer generally to P-9, the approximately 30 pages of documents she supplied Plaintiffs and the Court at the April 28 Hearing.

- She described having received approval for protected leave under the Family & Medical Leave Act for intermittent personal illness absences beginning on November 2, 2019—prior to the onset of the COVID-19 pandemic in March of 2020.

- She refused to provide information related to the "lay-offs" she described in the Substantial Loss of Income Statement, representing that such information was protected by HIPAA, although she confirmed that P-9 included a document related to FMLA protection she received for the period November 2, 2019

---

[4] A representative of Pathlight Property Management, Plaintiffs' property management company, also provided testimony at the April 28 Hearing.

through October 31, 2020, and explained that this related to an underlying health condition—not COVID-19.

- She refused to provide information related to the "extraordinary out-of-pocket medical expenses" she described in the Substantial Loss of Income Statement, representing that such information was protected by HIPAA; she also stated that she "had not done the math" with respect to the out-of-pocket expenses and could not state whether these were "extraordinary."

- She has not made any payment of rent to Plaintiffs since the filing of her appeal. She has made payments into the Court's escrow account during the calendar year 2019, but during 2020, she has made only three partial payments of the monthly amount owed—two in February 2020 and one in early March 2020.

- She made no attempts to come to Court to make payments in 2020 because the Court was not open after the pandemic began in March 2020 and the county was shut down.[5]

The Court finds that a single attempt to determine whether she a tenant—here, Ms. Jolly—could obtain government assistance for rent or housing does not constitute "best efforts." The Court finds that Ms. Jolly's inability to explain what she meant when she stated that she had suffered a "substantial loss of household income" calls into question the truthfulness of her Substantial Loss of Income Statement. And the Court finds that Ms. Jolly has not used best efforts to make timely partial payments with respect to the rent due and/or monies payable into the Court's escrow account to act as a supersedeas preventing her eviction from the Property. She paid nothing in January 2020; $1,000 in February, and $700 in March 2020.[6] Notably, the three payments made in 2020 were prior to the entry of various orders declaring a state of judicial emergency

---

[5] The Court notes that, while various Court orders declaring and extending the judicial state of emergency due to the COVID-19 pandemic were entered beginning in mid-March 2020, the courthouse itself was open for business in the sense that it continuously accepted materials for filing and/or payments related to court business throughout 2020.

[6] As noted above, pursuant to the Court's Order dated January 23, 2019 and the subsequent Order dated October 4, 2019, Ms. Jolly's monthly payments into escrow, serving as a bond for her appeal, should have totaled $1,530.00 each month.

4

due to the COVID-19 pandemic. Instead of making best efforts to make timely partial payments, Ms. Jolly has made no efforts to make any payments since the onset of the COVID-19 pandemic.

Plaintiffs argued at the April 28 Hearing that, in light of the distinction between "rent" and "escrow payments", drawn by both Ms. Jolly and her counsel during the April 28 Hearing, that eviction proceedings may go forward even absent a finding that Ms. Jolly's CDC Declaration was not truthful. Noting that the CDC Order expressly states that tenants may still be evicted "for reasons other than not paying rent or making a housing payment," Plaintiffs argue that, although the amount of the supersedeas bond is pegged off of the rental figure, see Pa. R. Civ. P. M.D.J. 1008, the monies are not rent—they are a bond that acts as a supersedeas (preventing eviction) during the pendency of an appeal. Defendant disagrees, noting the express relationship between the amount of the bond and the monthly rent figure. The Court agrees with Plaintiff, noting also that the bond could also be characterized as a "housing payment", and noting further that a landlord may request payment for the rent from the escrow account maintained by the Court. As noted hereinabove, however, that finding does not carry the day for the Defendant on this Petition.

The CDC Order specifically permits a landlord to challenge the truthfulness of a tenant's CDC Declaration. [P-1]. Plaintiffs have done so here. Ms. Jolly, who sought protection from eviction based on the CDC Order, must have complied with the conditions of that Order in order to enjoy that protection.[7] In light of the findings set forth

---

[7] Defendant suggests in her response that certain orders of issued by, inter alia, President Judge Kevin F. Kelly preclude the granting of the Petition. See Resp. ¶ 18. The Court disagrees. On March 16, 2020, an Emergency Order declared a judicial emergency in the thirty-second judicial district (the "Judicial Emergency Order"); on March 18, 2020, an Emergency Order specific to the stay of residential property

above, the Court finds that those conditions—truthful statements set forth in a CDC

Declaration—were not satisfied in this case.

For the reasons set forth above, IT IS hereby **ORDERED** and **DECREED** that the

Petition is **GRANTED;** and IT IS FURTHER **ORDERED** and **DECREED** that unless Ms.

Jolly makes a payment into the Court's escrow account in the amount of $25,840.00

(that is, monthly payments of $1,530.00 for the 18-month period of January 2020

through June 2021, minus the $1,700.00 that Ms. Jolly paid into escrow in February and

March 2020) **no later than June 30, 2021,** Plaintiffs may proceed with steps to evict

Ms. Jolly from the Property.[8]

BY THE COURT:

_____
KELLY D. ECKEL, J.

---

ejectment, eviction and/or possession (the "Emergency Residential Property Order") was entered and
made applicable through and including April 14, 2020. Thereafter, the Judicial Emergency Order was
extended multiple times, most recently on April 21, 2021, when the Seventh Extension of the Judicial.
Emergency Order was entered. Likewise, the Emergency Residential Property Order was extended a
handful of times, with the most recent extension—the Fourth Extension of the Emergency Residential
Property Order, dated July 10, 2020—extending the stay on execution of orders for eviction, ejectment,
and/or possession of residential properties and/or leasehold premises through and including August 31,
2020. There have been no further extensions of the Emergency Residential Property Order; thus, the
stay, pursuant to the Fourth Extension, expired last August and the relief granted by the Order on the
instant Petition is not inconsistent with any of the President Judge's Orders.

[8] The Court's Order assumes that Ms. Jolly will continue to reside in the Property in June 2021 and going
forward thereafter; in order to remain in the Property and maintain her appeal, the Rules require payment
of monies into escrow in the monthly amount previously specified.

FILED
05-25-2021 09:08 AM
OFFICE OF JUDICIAL SUPPORT
DELAWARE COUNTY, PA

**Patient Information**

| Patient Name | Sex | DOB |
|---|---|---|
| Jolly, Maketa | Female | |

**Visit Information**

| | Provider | Department | Encounter # |
|---|---|---|---|
| 3/23/2015 3:15 PM | Carl Meyer, MD | Internal Medicine Assoc Delaware County Media | 123554423 |

**Referring Provider**

Carl Meyer, MD

**Reason for Visit**

Physical
Reason for Visit History

**Vitals**

| BP | Ht | Wt | BMI  LMP |
|---|---|---|---|
| | | | kg/m2 |

**Progress Notes**

Meyer, Carl, MD at 3/23/2015 3:52 PM

Status: Signed    Editor: Meyer, Carl, MD (Physician)

SUBJECTIVE:



COPY

3. Essential hypertension, benign
Labs ordered
Continue current medication. Interested in changing diabetes medication from injectable to new oral.
Await a1c first.

PLAN:
Per orders and medications in EPIC.
See Assessment above


Electronically signed by Meyer, Carl, MD at 3/23/2015 3:53 PM

Not recorded

**Encounter Scans - 03/23/2015**
_____

**Encounter-Level Documents:**

_____

**Diagnoses**

| | |
|---|---|
| Routine general medical examination at a health care facility - Primary | V70.0 |
| Gestational diabetes | 648.80 |
| Essential hypertension, benign | 401.1 |

**Orders**

| | Expected by | Expires |
|---|---|---|
| | As directed | 6/15/2016 |
| | As directed | 6/15/2016 |
| HEMOGLOBIN A1C [C3 HUP Cerner] | As directed | 6/15/2016 |
| LIPID SCREEN [C010327 HUP Cerner] | As directed | 6/15/2016 |
| THYROID STIMULAT ORMONE [C350 HUP Cerner] | As directed | 6/15/2016 |
| RINE MICROALBUMIN [C102 HUP Cerner] | As directed | 6/15/2016 |

**Outpatient Medications as of End of Encounter - as of 3/23/2015**

| | Refills | Start | End |
|---|---|---|---|
| | 2 | 8/23/2014 | 3/26/2015 |
| | 3 | 6/9/2014 | 5/5/2015 |
| Needle 25G X 12MM XX MISC | 3 | 8/24/2014 | 3/26/2015 |

Allergies as of 3/23/2015     Reviewed On 3/23/2015 By: Meyer, Carl, MD



**CDC Eviction Moratorium – Revised Analysis**

**Overview**

The Centers for Disease Control and Prevention's order entitled "Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19," which took effect upon publication in the Federal Register on Sept. 4, declares a national moratorium on certain residential evictions in the name of protecting the public health. *See* 85 Fed.Reg. 55292 (Sept. 4, 2020).

In summary, the order enables tenants who meet certain criteria to invoke protection against eviction by providing a signed declaration to their landlords. *See* 85 Feg.Reg. at 55293. To sign the declaration, a tenant needs to meet five essential criteria:

- Expect to have income less than \$99,000 in 2020, or have received a stimulus check, or not have been required to report income to the IRS in 2019;
- Be unable to pay full rent due to an income loss or "extraordinary" medical bills
- Have used best efforts to obtain governmental rent assistance,
- Be likely to become homeless or forced to "live in close quarters" if evicted, and
- Promise to "make timely partial payments that are as close to the full payment as the individual's circumstances may permit."



*See* 85 Feg.Reg. at 55293. Once a tenant has provided the declaration, the text of the order states that a landlord shall not "evict" the tenant from residential premises. *See* 85 Fed.Reg. at 55296. "'Evict' and 'Eviction'" are defined to mean "any action by a landlord, owner of a residential property, or other person with a legal right to pursue eviction or a possessory action, to remove or cause the removal of a covered person from a residential property." 85 Fed.Reg. at 55293.

But for the CDC moratorium, the United States would likely have already begun experiencing a truly catastrophic level of evictions—20 million or more, affecting as many as 40 million tenants.[1] Even so, a combination of gaps and pitfalls in the CDC moratorium itself, aggressive landlords, and hostile courts have seen many evictions proceed nonetheless.[2] The CDC itself has contributed to this erosion and circumvention of the Sept. 4 order, issuing a guidance document (largely in the form of an FAQ) on October 9 that raises new ambiguities and appears to weaken some tenant protections. See CDC Eviction Moratorium FAQ (Oct. 9, 2020), on-line at: https://www.cdc.gov/coronavirus/2019-ncov/downloads/eviction-moratoria-order-faqs.pdf.

---

[1] See, e.g., Emily Benfer et al., "The COVID-19 Eviction Crisis: An Estimated 30-40 Million People in America Are at Risk," Aspen Institute (Aug. 7, 2020), https://www.aspeninstitute.org/blog-posts/the-covid-19-eviction-crisis-an-estimated-30-40-million-people-in-america-are-at-risk/

[2] See, e.g., Chris Arnold, "Despite A New Federal Ban, Many Renters Are Still Getting Evicted," NPR (Sept. 14, 2020), https://www.npr.org/2020/09/14/911939055/despite-a-new-federal-ban-many-renters-are-still-getting-evicted

**Judicial challenges to the CDC Order and the FAQ document**

The recent FAQ document appears to have been largely triggered by events transpiring in litigation of three federal lawsuits against the CDC order. Landlord groups filed those actions in September with the U.S. District Courts in Atlanta, Memphis, and Columbus, seeking orders declaring the CDC order unconstitutional.[3] In each case, the landlord groups moved for preliminary injunctions to prohibit enforcement of the CDC order pending trial.

The government's first written response to these lawsuits was a legal brief the Department of Justice filed in defense of the CDC order on October 2. While generally refuting various legal challenges the landlord groups had leveled against the CDC order, the DOJ brief contained several statements that were surprising and disappointing to tenant advocates. Responding to landlord groups' contention that the CDC order impermissibly infringed on their right of access to the judicial system, the DOJ brief stated that the CDC order does not prevent landlords from filing state court eviction lawsuits:

> "First, the Order expressly permits eviction for various reasons other than nonpayment of rent. Second, nowhere does the Order prohibit a landlord from attempting to demonstrate that a tenant has wrongfully claimed its protections. And third, even where a tenant is entitled to its protections, the Order does not bar a landlord from commencing a state court eviction proceeding, provided that that actual eviction does not occur while the Order remains in place."

Dkt. No. 22, Defendants' Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction at 42, Case No. 1:20-cv-03702-JPB (N.D.Ga. Oct. 2, 2020) (internal citation omitted).

Shortly after this brief was filed, DOJ entered into a stipulation for dismissal with the plaintiffs in the Columbus lawsuit, *KBW Investment Properties v. Azar*, predicated on the understanding that CDC and the DOJ adhered to this view of the order:

> "NOW THEREFORE, the Federal Defendants having stated that the CDC Order does not prevent a landlord from seeking judicial review of a tenant's right to remain on his or her property, including seeking an evidentiary hearing to challenge the veracity of a declaration, provided that no actual eviction occurs while the Order remains in effect and applies to the tenant, Plaintiff and Federal Defendants hereby stipulate to dismissal of this Action…"

Dkt. No. 22, Stipulation for Dismissal at 3, Case No. 2:20-cv-04852 (S.D.Ohio, Oct. 8, 2020). The next day, the CDC issued its FAQ document, which reflected the same strange concessions:

> "The Order is not intended to terminate or suspend the operations of any state or local court. Nor is it intended to prevent landlords from starting eviction proceedings, provided that the actual eviction of a covered person for non-payment of rent does NOT take place during the period of the Order."

CDC FAQ at 1.

**Is the DOJ brief, stipulation, or FAQ document entitled to deference?**

Preliminarily, interpretive guidance documents that are not promulgated through notice and comment or other formal rulemaking are not entitled to the strongest form of deference (known as "*Chevron*

---

[3] These cases are *Brown v. Azar,* No. 1:20-cv-03702 (N.D.Ga.), *KBW Investment Properties LLC v. Azar,* No. 2:20-cv-04852 (S.D.Ohio), and *Tiger Lilly LLC v. HUD,* No. 2:20-cv-02692 (W.D.Tenn.).

deference" based on the case of *Chevron U.S.A. v. National Resources Defense Council).* [4] See *Christensen v. Harris Cty.,* 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant Chevron-style deference."). However, such materials can be entitled to lesser forms of deference in some circumstances. *See, e.g., Gonzales v. Oregon,* 546 U.S. 243, 268 (2006) (deference to agency may be appropriate "in accordance with ... the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."), citing *Skidmore v. Swift & Co.,* 323 U.S. 134 (1944).

A particular form of lesser deference, known as "*Auer*" deference, applies to agency interpretations of their own regulations. See *Auer v. Robbins,* 519 U.S. 452 (1997). The basic concept of *Auer* deference is that "the agency that promulgated a rule is in the 'better position [to] reconstruct' its original meaning." *Kisor v. Wilkie,* __ U.S. __;139 S. Ct. 2400, 2412 (2019), *quoting Martin v. Occupational Safety and Health Review Comm'n,* 499 U.S. 144, 152 (1991). Hence an agency's interpretation of its own regulation is to be deemed controlling "unless plainly erroneous or inconsistent with the regulation." *Auer* at 462, citing *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 359 (1989) (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414 (1945)).

The Supreme Court recently revisited the *Auer* deference standard, and further clarified that an agency's interpretation of its own regulation has no possibility of deference unless the regulation is "genuinely ambiguous" and reflects "an agency's authoritative, expertise-based, 'fair [or] considered judgment." *Kisor v. Wilkie,* __ U.S. __, 139 S.Ct. 2400, 2414 (2019), quoting *Auer* at 462. The DOJ brief and stipulation (filed and made on behalf of CDC and the other governmental defendants) have no possibility of being entitled to *Auer* deference under this standard. As landlord-tenant law and eviction matters are outside CDC's area of expertise, CDC's interpretation of an eviction restriction is not based on authoritative expertise. *See Kisor* at 2417 ("the agency's interpretation must in some way implicate its substantive expertise"). Even if it was, the original order was not genuinely ambiguous in prohibiting the eviction of covered tenants, having specifically defined "evict" to include "any action by a landlord ... to remove or cause the removal of a covered person from a residential property." 85 Fed. Reg. at 55293.

The *Kisor* court also stated that "a court should decline to defer to a merely 'convenient litigating position' or '*post hoc* rationalizatio[n] advanced' to 'defend past agency action against attack.'" *Kisor* at 2417, quoting from *Christopher v. SmithKline Beecham Corp.,* 567 U.S. 142, 155 (2012). The statements in the DOJ brief (and reiterated in the stipulation) were clearly products of a "convenient litigation position," having been asserted in legal pleadings responding to claims challenging the order as an unconstitutional restriction on court access.[5]

---

[4] *Chevron U.S.A., Inc., v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984) (court defers to reasonable interpretation of a statute by agency to whom Congress has delegated power to speak with the force of law).

[5] Irrespective of this purpose, the position taken by DOJ was not necessary to defend against these court access claims. Multiple courts have held that emergency eviction moratoria do not completely foreclose access to court (as is necessary to establish a judicial access claim), both because of their temporary nature and the availability of other judicial mechanisms to adjudicate the claims. *See, e.g., Baptiste v. Kennedy,* __ F.Supp.3d __, 2020 WL 5751572 at *25 (D. Mass. 2020); *Elmsford Apartment Assocs., LLC v. Cuomo,* __ F.Supp.3d __, 2020 WL 3498456, at

A potentially significant difference between the FAQ and the DOJ materials is that the FAQ purports to incorporate HUD's views on the CDC Order as well as CDC's own. *See* FAQ at 1 (italicization added). Since HUD would likely be presumed (however incorrectly) to have expertise in the relevant aspects of housing law, this suggests some possibility that the document might be viewed to reflect substantive expertise in the relevant subject matter (even though in that case, the expertise would be that of HUD, not the agency that issued the order[6]). The imprimatur of HUD could potentially entitle the FAQ to *Auer* deference then, at least with respect to contents interpreting genuinely ambiguous portions of the original order. See *Kisor* at 2414, c.f. FAQ at 1 ("This non-binding guidance document...").

Of course, *Auer* deference would remain inappropriate as to any portions of the original CDC order that are not genuinely ambiguous—in particular, the question of whether eviction lawsuits or other actions to remove or cause the removal of covered persons could lawfully be taken as the original order made clear that they could not). *See Kisor* at 2415 ("if there is only one reasonable construction of a regulation—then a court has no business deferring to any other reading, no matter how much the agency insists it would make more sense. Deference in that circumstance would 'permit the agency, under the guise of interpreting a regulation, to create de facto a new regulation.'"), quoting from *Christensen,* 529 U.S. at 588. And while the FAQ may not be as clearly a product of defensive litigation as the DOJ's actual response brief or resulting stipulation, the circumstances leading up to the FAQ's issuance certainly suggest courts ought not defer to the FAQ on the permissibility of filing eviction lawsuits for that reason as well.

**Geographical applicability**

The CDC order applies in every U.S. state and territory with reported cases of Covid-19, except for states, local territorial, or tribal areas that already have "a moratorium on residential evictions that provides the same or greater level of public health protection than the requirements listed in this Order." 85 Feg.Reg. at 55294. "Public-health protection" is not expressly defined in the CDC Order but presumably means protection against residential eviction, given the overall thrust of the order is to stop residential evictions so as to reduce the spread Covid-19.

Thus, American Samoa, having no reported cases of Covid-19, is clearly not covered "until such time as cases are reported." 85 Feg.Reg. at 55294. Other U.S. jurisdictions having no eviction moratoria of their own are clearly covered.

For jurisdictions that do have their own eviction moratoria, the original text was unclear as to how CDC applicability would be determined. One possible interpretation was that some person or entity (perhaps

---

*16 (S.D.N.Y. 2020). Even if judicial access claim were cognizable, restrictions on court access in the civil context that do not implicate fundamental rights require only a rational basis—which the prevention of mass evictions during an infectious disease pandemic would easily fulfill. *See U.S. v. Kras,* 409 U.S. 434, 445 (1973) (bankruptcy filing fees did not unconstitutionally infringe on debtor's access to court because the fees had a rational basis and debtor did not have a fundamental right in filing a bankruptcy petition).

[6] *Note U.S. v. Mead Corp.,* 533 U.S. 218, 228 (2001) ("The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position. The approach has produced a spectrum of judicial responses, from great respect at one end to near indifference at the other.") (underline added, internal citations omitted).

the CDC, a court, or other official) would make a threshold determination of whether the local moratorium provides equal or better public health protection—in which case the local moratorium would apply and the CDC order would not. Alternatively, the CDC order could be interpreted as establishing a "floor," with local eviction moratoria able to afford equal or greater protection against eviction but irrelevant if they afford less protection.[7] This would call for the CDC order to be compared with local restrictions on a case-by-case basis, with the more protective provision applying and the local provisions taking precedence over the CDC order where the protections are equivalent.

The FAQ resolves this question, drawing the same conclusion most advocates had drawn (given the purpose of the order and the many practical difficulties of a threshold-assessment approach), that the order's applicability is to be determined by courts:

> "The Order applies only in states (including the District of Columbia), localities, territories, or tribal areas that do not have in place a moratorium on residential evictions that provides the same or greater level of public-health protection than the CDC's Order. Relevant courts deciding these matters should make the decision about whether a state order or legislation provides the same or greater level of public health protection."

FAQ at 4.

While the text does not make this explicit, this can only mean the CDC order provides a baseline level of protection for residential tenants against eviction with other protections arising under state, local, territorial, or tribal law applying in addition to the CDC order where they exist—as adjudicated on a case-by-case basis.

**Covered housing types**

The CDC order prohibits any "a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action" from evicting a covered person from "from any residential property" in a jurisdiction where the order applies. *See* 85 Feg.Reg. at 55296. The terms "landlord" and "owner" are not further defined. "Residential property" is defined to include "any property leased for residential purposes," and goes on to specify the term includes "any house, building, mobile home or land in a mobile home park, or similar dwelling leased for residential purposes." *See* 85 Feg.Reg. at 55293. However, the definition does "not include any hotel, motel, or other guest house rented to a temporary guest or seasonal tenant" as defined under state law. *See* 85 Feg.Reg. at 55293.

Therefore, the order clearly applies to all standard rental housing, whether publicly or privately operated. Persons leasing rooms in residential motels and other marginal housing situations may not be covered, however—though coverage of such properties will depend heavily on state law (particularly how a "temporary guest or seasonal tenant" might be distinguished from an ordinary tenant). The FAQ does not add significant clarity to this definition, though does employ the terms "hotel rooms" and "motel rooms," which could be significant in some instances. *See* FAQ at 5 ("[t]he Order does not apply to hotel rooms, motel rooms, or other guest house rented to a temporary guest or seasonal tenant…").

---

[7] Though the order uses the term "public-health protection," this term appears synonymous with protection from eviction in this context because the threat to public health under discussion is the anticipated spread of Covid-19 that residential evictions would cause. *See* 85 Feg.Reg. at 55294.

**Types of evictions prohibited**

There are two key limitations on the types of evictions prevented by the order. First, the order prohibits only the eviction of "covered persons." *See* 85 Feg.Reg. at 55296. To be a covered person, a tenant must sign a form declaration and provide a copy to the lessor, and only those meeting certain need-based criteria and agreeing to make partial payments and seek government rental assistance may properly sign the declaration (see below for more detail). *See* 85 Feg.Reg. at 55293.

Second, the order lists five categories of evictions that it does not preclude:

> "Nothing in this Order precludes evictions based on a tenant, lessee, or resident: (1) engaging in criminal activity while on the premises; (2) threatening the health or safety of other residents; (3) damaging or posing an immediate and significant risk of damage to property; (4) violating any applicable building code, health ordinance, or similar regulation relating to health and safety; or (5) violating any other contractual obligation, other than the timely payment of rent or similar housing-related payment (including non-payment or late payment of fees, penalties, or interest)."

*See* 85 Feg.Reg. at 55294.

Accordingly, advocates should argue that the order prohibits any eviction (of a covered person) not falling into the five exempted categories. This interpretation would at least block all evictions (of covered persons) for nonpayment of rent, lease expiration/no cause, and any other evictions unrelated to a tenant's lease violation.

The text of the original order supports this position. While the order does not explicitly state that the included list of permissible grounds for eviction is exclusive, the order does state that the prohibition on evicting covered persons is "subject to the limitations in the 'Applicability' section," 85 Fed.Reg. at 55296. The Applicability section provides only the enumerated list of grounds for eviction set forth above. *See* 85 Fed.Reg. at 55294.

One portion of the FAQ states that a tenant "may still be evicted for reasons other than not paying full rent or making a full housing payment" and then goes on to repeat the list of enumerated grounds. FAQ at 4-5. Nothing in the original order or the FAQ appears to authorize eviction for a reason other than one of the enumerated grounds.

In other places, however, the FAQ suggests that the order only prevents evictions based on nonpayment. In response to the question "What does it mean when a tenant has declared themselves to be a covered person under the CDC Order," the FAQ states that covered persons "may not be evicted for non-payment of rent <u>solely on the basis of the failure to pay rent or similar charges</u> at any time during the effective period of the Order." FAQ at 6 (underline added). In another place, the FAQ states "[t]he effective date of the CDC Order is September 4, 2020. That means that any evictions for nonpayment of rent that may have been initiated before September 4" are subject to the order. FAQ at 7. These provisions create ambiguity upon which some landlords will likely contend that the CDC order only restricts cases based on nonpayment of rent (and possibly "similar" charges). Courts should reject any contentions of this nature.

First, the FAQ statements above were not made in the context of questions geared to delineating the universe of reasons for eviction and specifying which are permissible and which are not. One of the

statements appeared in a broader discussion of a tenant's liability for rent during the period of the order and the permissibility of partial payments and payment plans, FAQ at 6, while the other dealt with the timing of the order and its application to previously-filed cases, FAQ at 6-7. Second, while neither the original order nor the FAQ specifically consider the permissibility of evictions other than for either nonpayment of rent or charges or for other lease violations, an honest reading of the original order and the FAQ reveals a clear purpose and intent only to allow evictions based on tenant misconduct—not financial defaults, and certainly not evictions where the tenant committed no lease violation whatsoever. All of the enumerated grounds for eviction involved behavioral lease violations. *See Beecham v. United States,* 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."); *see also U.S. v. Williams,* 553 U.S. 285, 294 (2008) ("common sense canon of noscitur a sociis ... counsels that a word is given more precise content by the neighboring words with which it is associated"). Nothing in the FAQ or other document indicate any intent by CDC to expand these categories.

For this reason, some landlords may attempt to use semantic methods that characterize particular circumstances as lease violations fitting within the fifth enumerated ground ("violating any other contractual obligation, other than the timely payment of rent or similar housing-related payment"). *See* 85 Feg.Reg. at 55294. Probably the most common of these would be a tenant's failure to vacate upon lease expiration, as many leases expressly obligate a tenant to vacate upon expiration of a fixed lease term. Yet requiring a tenant to vacate the premises in order to avoid eviction for having failed to vacate would be an absurd result that courts will likely reject. *See, e.g. Haggar Co. v. Helvering,* 308 U.S. 389, 394 (1940) ("All statutes must be construed in the light of their purpose. A literal reading of them which would lead to absurd results is to be avoided when they can be given a reasonable application consistent with their words and with the legislative purpose."). Such a construction would also run contrary to the public health purpose of the order. *See* 85 Feg.Reg. at 55294 ("Evicted renters must move, which leads to multiple outcomes that increase the risk of COVID–19 spread."). Instead, courts will likely read the provision authorizing eviction for violations of "other contractual obligations" to mean contractual obligations to be carried out *during the term of the lease*—not after the lease has expired. *See* 85 Feg.Reg. at 55294; *see also Haggar Co.* at 394.

While the CDC did not address this specific circumstance in the FAQ, the document did make clear that "[i]ndividuals who are confirmed to have, have been exposed to, or might have COVID-19 and take reasonable precautions to not spread the disease should not be evicted on the ground that they may pose a health or safety threat to other residents." FAQ at 5. This statement lends some support to the notion that courts should interpret the permissible grounds for eviction practically and in a manner consistent with the overall purpose of the order, avoiding highly-technical assessments that lose sight of the public health imperatives at stake.

**Qualifying as a covered person**

To be a "covered person" entitled to the protection of the order, one must be a "tenant, lessee, or resident of a residential property" and provide the required declaration, sworn under penalty of perjury, to the landlord. *See* 85 Feg.Reg. at 55293.

The order includes, as an attachment, a form declaration for this purpose, though the order also makes clear that tenants may use a different form as long as the required contents are present and the declaration is sworn under penalty of perjury. *See* 85 Feg.Reg. at 55292 ("To invoke the CDC's order these persons must provide an executed copy of the Declaration form (or a similar declaration under penalty of perjury) to their landlord..."), 55297 (form declaration). The FAQ further clarifies that "[t]he

declaration may be signed and transmitted either electronically or by hard copy," and further that "declarations in languages other than English are compliant if they contain the information required to be in a declaration, are signed, and include a statement that the covered person understands that they could be liable for perjury..." FAQ at 1-2.

The preamble to the form declaration, the supplementary information accompanying the order, and now the new FAQ state that "[e]ach adult listed on the lease, rental agreement, or housing contract should complete this declaration," though it remains unclear what the effect of having fewer than all listed adults sign the declaration could possibly be. *See* 85 Feg.Reg. at 55292, 55297; see FAQ at 1-2. Surely CDC would not intend to authorize the eviction of some adults and not others from the same household, as such an absurd interpretation would neither advance the purpose of the order (preventing displacements that could spread Covid-19) nor serve the landlord's objective (regaining possession of rental premises in hopes of securing a new tenant able to pay full rent). The CDC's ongoing and consistent use of the non-mandatory term "should" throughout the original materials as well as the FAQ reinforce this conclusion. *See* FAQ at 1-2.

The FAQ states that "[i]n certain circumstances, such as individuals filing a joint tax return, it may be appropriate for one member of the residence to provide an executed declaration on behalf of other adult residents party to the lease, rental agreement, or housing contract at issue." FAQ at 1. This provision could be of value in households where an adult member is unable to sign a declaration due to disability, unavailability, or other impediment (though the reason third-party signers are limited to other household members or contractual parties rather than anyone with personal knowledge is not clear).

The contents of the declaration, which essentially function as eligibility criteria for the protection of the CDC order, are as follows (from the form declaration at 85 Fed.Reg. 55297):

- I have used best efforts to obtain all available government assistance for rent or housing

"Available governmental assistance" is a term of art in the order, which means "any governmental rental or housing payment benefits available to the individual or any household member." *See* 85 Feg.Reg. at 55293. The wording of the form declaration is unfortunate here. The use of the past tense suggests a tenant who may have failed to apply for rental assistance grants previously available might be reluctant to sign the affidavit. However, any tenant with any passable reason for not having applied (e.g., unaware of the funds, did not qualify, funds ran out before tenant could apply, tenant was not delinquent at the time the funds were available, etc.) should still be able to claim "best efforts." Moreover, a tenant can scarcely be expected to have foreseen before September that a failure to apply for assistance funds would deny that tenant protection under a future CDC order. Therefore, even if the tenant may have failed to make best efforts to apply for assistance funds in the past, a tenant could still credibly make the declaration by undertaking in the present a best effort to investigate and apply for any funds presently available before signing. **Note the definition only applies to governmental benefits** so does not require the tenant to have investigated all private sources of assistance.

The FAQ adds a series of links to resources that landlords and tenants "are encouraged" to access for learning about possible rental assistance. FAQ at 5. While the order neither requires use of these resources nor attributes specific legal significance to not using them, a best practice may be to ensure tenants investigate possible rental assistance available at each of the links in the FAQ before certifying they have made best efforts to obtain governmental rental assistance.

- I either expect to earn no more than $99,000 in annual income for Calendar Year 2020 (or no more than $198,000 if filing a joint tax return), was not required to report any income in 2019

8

to the U.S. Internal Revenue Service, or received an Economic Impact Payment (stimulus check) pursuant to Section 2201 of the CARES Act.

The key here is that these are **three alternative ways of qualifying for protection**. That is, a tenant may have income less than $99,000 (or $198,000 together with spouse if married and filing jointly) or have not been required to report income in 2019 or have received a stimulus check.

As has been well-reported in the media, many individuals eligible for stimulus checks did not receive them in a timely manner—and some have not received them at all.[8] Advocates should assert that a tenant qualifies for protection under the stimulus check prong if the tenant was eligible to receive a stimulus check, whether or not the funds were ever actually received.

- I am unable to pay my full rent or make a full housing payment due to substantial loss of household income, loss of compensable hours of work or wages, lay-offs, or extraordinary out-of-pocket medical expenses.

Note that **there is no requirement here of demonstrating a link between income loss and Covid-19**. The order defines "extraordinary" medical expenses as "unreimbursed medical expense likely to exceed 7.5% of one's adjusted gross income for the year." 85 Fed.Reg. at 55297 (fn 38). The order imposes no obligation to supply documentation of any income loss or medical expenses.

- I am using best efforts to make timely partial payments that are as close to the full payment as the individual's circumstances may permit, taking into account other nondiscretionary expenses.

Presumably a tenant who calculates, in good faith, a reasonable partial payment she can afford and tenders those funds complies with this obligation—even if the may landlord think the tenant could have afforded more. No provision in the order purports to allow a landlord to proceed with eviction of a tenant who fails to make partial payments—let alone partial payments the landlord considers insufficient. The order and form declaration both ensure tenants understand the "declaration is sworn testimony, meaning that [a tenant] can be prosecuted, go to jail, or pay a fine if [they] lie, mislead, or omit important information." 85 Fed.Reg. at 55297. This suggests the intended consequence for a false declaration is prosecution for perjury—not eviction. *See also HAPCO v. City of Philadelphia*, 2020 WL 5095496 (E.D.Pa. 2020) (Rejecting claim that local eviction moratorium that protects tenants who submit certification of Covid-related financial hardship violates due process clause on basis that "the certifications of hardship must comply with Section 1-108 of the Philadelphia Code which require certifications to be sworn to under oath and, in any event, it is not arbitrary and irrational for the City to not provide landlords with the means of challenging whether tenants have truly experienced a COVID-19 financial hardship").

Nevertheless, the DOJ materials and ensuing FAQ have stated that "[t]he Order does not preclude a landlord from challenging the truthfulness of a tenant's declaration in any state or municipal court." FAQ at 6. The rationale for this conclusion is the theory that a tenant who does not actually qualify as a covered person is not entitled to the protection of the CDC order and should not be able to benefit from the protection by submitting a false declaration. While this reasoning is hardly assailable, allowing a

---

[8] *See, e.g..*, Lorie Konish, "Still waiting on stimulus check money? IRS urges you to take action before these two deadlines," CNBC (Aug. 17, 2020), on-line at: https://www.cnbc.com/2020/08/17/missing-1200-stimulus-checks-irs-urges-action-before-these-deadlines.html, last visited Sept. 4, 2020.

landlord to challenge the contents of a declaration (and thereby forcing a tenant to defend it) denies that tenant the full benefit of the protection and directly undercuts the public purpose of the CDC Order—particularly if such challenges are routine and some tenants who do qualify as covered persons fail to receive protection simply because they are unable to comply with judicial procedures or are found to lack credibility by courts.

Accordingly, advocates should urge courts to take a balanced approach to claims challenging the veracity of tenant declarations:

- Courts should generally accept tenant "covered person" declarations as prima facie evidence that the declarant is a covered person—thus placing the burden of refuting the declarant's covered person status on the landlord;
- A landlord seeking to challenge the contents of a tenant's declaration should be required to establish material falsity—e.g., that the tenant's declaration contained a false statement, without which the tenant would not have fulfilled the requirements to be a covered person; and
- The showing of material falsity should be supported by documentation or other proof that would be sufficient to overcome the tenant's declaration if unrebutted.

Courts should be extremely reluctant to entertain allegations of material falsity based on statements requiring tenants to exercise judgment (such as in determining how much of a partial rent payment the tenant can afford) or predict hypothetical outcomes (such as whether the tenant would become homeless or forced to live in close quarters if evicted). Challenges predicated on statements of that nature should require evidence either that the tenant knew the statement was false (or, at least, made the statement recklessly without knowledge as to its truth or falsity), or else that no reasonable tenant would have made the statement.

Note that this approach is similar to the framework the U.S. Supreme Court established for determining when a criminal defendant may challenge the veracity of statements in a police informant's affidavit used to obtain a search warrant:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*Delaware v. Franks*, 438 U.S. 154, 171 (1978). The specific policy reasons for according finality to a covered person declaration are obviously different than those for according finality to an affidavit presented in support of a search warrant application, but in both situations, merely allowing the challenge could be damaging to the public interest—and therefore should be conditioned on more than conclusory allegations or a "mere desire to cross-examine." *Id.* at 171.

Nothing in the FAQ or other materials suggests what procedures court should use in hearing these challenges. However, one logical method would be to require landlords to apply for a show cause order from the court, which may then be served upon a tenant (ordering the tenant to show cause why a declaration should not be found invalid because of a fraudulent statement). Before issuing such a show cause order, the court would review the landlord's allegations and corroborating evidence, and grant the order only if it finds sufficient evidence of material falsity to overcome the tenant's declaration.

10

Where CDC declarations are presented in the course of pending eviction actions, a court could replace the show cause requirement with an offer of proof.

Whether courts adopt these or other procedures for hearing landlord challenges to tenant declarations, such challenges will likely gain the most traction where landlords are able to present evidence of bad faith (or, perhaps, lack of good faith) on the tenant's part. Thus, tenants should avoid making unreasonably low partial payments (based on their ability to pay) and should use discretion in sharing information about their available resources with landlords or publicly that might be used to question the amount of their payments or the integrity of other declaration contents.

- If evicted I would likely become homeless, need to move into a homeless shelter, or need to move into a new residence shared by other people who live in close quarters because I have no other available housing options.

The order defines "[a]vailable housing" as essentially meaning decent and affordable housing that is presently available to the tenant. See 85 Fed.Reg. at 55293 ("any available, unoccupied residential property, or other space for occupancy in any seasonal or temporary housing, that would not violate Federal, State, or local occupancy standards and that would not result in an overall increase of housing cost to you."). Hence, a tenant need not be willing to accept any housing irrespective of price, condition, or location as an alternative to becoming homeless.

- I understand that I must still pay rent or make a housing payment, and comply with other obligations that I may have under my tenancy, lease agreement, or similar contract. I further understand that fees, penalties, or interest for not paying rent or making a housing payment on time as required by my tenancy, lease agreement, or similar contract may still be charged or collected.

Unlike the CARES Act eviction moratorium,[9] the CDC order provides no relief from late fees and related charges—except that the tenant may not be evicted for nonpayment of those amounts while the CDC order is in effect. See 85 Fed.Reg. at 55294; see also FAQ at 3. This could be one area where state and local protections commonly exceed the CDC minimum.[10]

- I further understand that at the end of this temporary halt on evictions on December 31, 2020, my housing provider may require payment in full for all payments not made prior to and during the temporary halt and failure to pay may make me subject to eviction pursuant to State and local laws.

Advocates may wish to evaluate how this statement interacts with any rights or protections under state and local laws—particularly provisions of state landlord-tenant acts that may provide non-waivable rights likely unaffected by the CDC order.

- I understand that any false or misleading statements or omissions may result in criminal and civil actions for fines, penalties, damages, or imprisonment;

The form affidavit is big on intimidating language.

---

[9] See 15 U.S.C. § 9058(b)(2).

[10] Note that preserving the landlord's right to collect late fees and other charges authorized by the lease may help the order avoid a takings challenge.

- Declarant must certify the truth and correctness of the contents "under penalty of perjury, pursuant to 28 U.S.C. 1746."

The form affidavit is big on intimidating language, as may have been previously mentioned. The FAQ mitigates these provisions somewhat, acknowledging that perjury prosecutions (based on the declaration) should be limited to circumstances where the tenant makes a false statement in bad faith:

> **What if individuals act in bad faith when completing and submitting the declaration?**
> Anyone who falsely claims to be a covered person under this Order by attesting to any material information which they do not believe to be true may be subject to criminal penalties under 18 U.S.C. § 1621 (perjury) or other applicable criminal law.

FAQ at 7 (i.e., the final page of the document that few tenants are likely read).

### Stages of eviction process affected

The order prohibits a landlord from "evict[ing]" a covered person from residential rental property. *See* 85 Fed.Reg. at 55296. Again, the order defines "'Evict' and 'Eviction' [to] mean[] *any action* by a landlord, owner of a residential property, or other person with a legal right to pursue eviction or a possessory action, to remove or cause the removal of a covered person from a residential property." 85 Fed.Reg. at 55293. Hence, under its plain meaning the CDC order reaches <u>all phases</u> of the eviction process (issuance of notices to vacate, filing unlawful detainer actions, holding hearings, entering judgments for possession and writs of restitution, physical execution of writ). Of course, these are the waters the recent FAQ and DOJ materials have muddied.

*Physical evictions of tenants against whom judgments or writs have been entered.*
One item the FAQ document makes crystal clear is that physical evictions cannot be carried out during the period of the CDC order. See FAQ at 6-7 ("any evictions for nonpayment of rent that may have been initiated before September 4, 2020, and have yet to be completed, will be subject to the Order.").

*Entry of judgments or writs against tenants in pending eviction cases.*
Under the plain text of the order, prosecuting a pending eviction lawsuit against a covered person—such as filing or advancing any motion for judgment or writ of restitution—would appear to be prohibited as such actions are clearly taken to remove or cause the tenant's removal. See 85 Fed.Reg. at 55296. While a court may hear challenges to a tenant declaration, such challenges are proper only where the landlord contends the tenant is not actually a covered person (which would render the order inapplicable). See FAQ at 6.

Furthermore, as a general matter of state law, a landlord would not be entitled to judgment unless the landlord proved a present or immediate right to possession of the disputed premises. See, e.g., Robert M. Schoenhaus, Forcible Entry and Detainer: Requisite Right, Title or Possession of Plaintiff, 21 Am. Jur. Proof of Facts 2d 567 (Originally published 1980, updated Sept. 2020). The CDC order does not preempt or supplant state law. See FAQ at 6. Since the CDC order entitles a covered person to possession of his or her home for the duration of the order, a court could not properly enter a judgment or writ against such person while the order remains in effect. Even if such orders could be entered, doing so would create extensive practical problems and burdens on courts considering that tenants are likely to remain for two months or longer in their homes and tender partial payments (or even fully catch up in rent) during that time—and that in many cases, new agreements or facts would require courts to revisit judgments, set aside writs of restitution, and otherwise conduct further proceedings in cases that had already been heard and supposedly decided.

Some landlords may contend that entry of judgments and writs during the CDC order is proper, noting the FAQ document also states "[t]he Order is not intended to terminate or suspend the operations of any state or local court." FAQ at 1. But this general statement does not support the conclusion that judgments and writs of restitution are proper—only that some (not otherwise specified) proceedings may be held.

*Filing new eviction cases.*
Again, the definition of "eviction" to include any action to remove or cause the removal of a covered person would appear to prohibit the filing of eviction actions against covered tenants during the CDC order. See 85 Fed.Reg. at 55293.

Problematically, the DOJ stipulation—quoting from its prior brief—stated as follows:

> "The [CDC] Order does not prevent a landlord from filing an eviction action in state court. First, the Order expressly permits eviction for various reasons other than nonpayment of rent. . . Second, nowhere does the Order prohibit a landlord from attempting to demonstrate that a tenant has wrongfully claimed its protections. And third, even where a tenant is entitled to its protections, the Order does not bar a landlord from commencing a state court eviction proceeding, provided that that actual eviction does not occur while the Order remains in place."

The FAQ then states, similarly, that the order does not "prevent landlords from starting eviction proceedings, provided that the actual eviction of a covered person for non-payment of rent does NOT take place during the period of the Order." FAQ at 1.

Arguably, these statements can be reconciled with the text of the original order by construing the stipulation to establish that (i) landlords can still file eviction lawsuits during the CDC order either where they dispute a tenant's status as a covered person or assert an authorized basis, and (ii) a landlord may take steps to tee-up a state court eviction proceeding, such as retaining counsel, even against a covered person. A fair reading of these materials does not leave one with the frank DOJ or CDC meant any such thing by these statements; rather, the plain meaning of the new material appears to allow for the filing of state court eviction lawsuits even against covered tenants during the CDC order. But as discussed above, that reading is fully contradictory to the text of the original order and not entitled to deference. *See Kisor* at 2414.

Even so, the fact that in most—if not all—states, the plaintiff's present right to possession is an indispensable element of an eviction lawsuit creates a practical state law impediment to filing an eviction lawsuit against a person who is occupying under the CDC order. *See* 21 Am. Jur. Proof of Facts 2d 567, *supra.* Advocates may prefer to seek orders dismissing such improper lawsuits on state law grounds for failure to state claims upon which relief may be granted rather than litigate what paltry deference the CDC and DOJ interpretive documents may deserve.

*Issuing eviction notices.*
Perhaps most problematically, the CDC and DOJ assertions that eviction lawsuits are permissible against covered persons during the term of the order necessarily implies that landlords may serve notices to vacate premises (directing tenants to move out before January 1, 2021). This is a truly self-defeating bit of guidance in that tenants frequently move out of rental premises upon receiving such notices, not only because they are "supposed to" (as a matter of state law) but also to avoid being sued and acquiring an unlawful detainer case record that will seriously hamper their access to future housing opportunities. Again, since the CDC order effectively authorizes a covered tenant to remain through Dec. 31, 2020, any

such notice to vacate stating an earlier date to quit would presumably at least be ineffective if issued to a covered tenant, a further reason for dismissal of any lawsuit filed upon expiration of such notice.

*Self-help/extrajudicial eviction*

Finally, the CDC order's definition of "eviction" likely also reaches at least some, if not all, conduct such as threats, intimidation, misinformation, or self-help measures taken to remove a tenant. While state landlord-tenant laws generally already provide superior civil remedies for lockouts and other extrajudicial eviction practices, the significant criminal penalties available under the CDC order may pose a more powerful deterrent against such practices—or enable a truly far-reaching remedy for egregious violators.

The FAQ states that "[t]he U.S. Department of Justice prosecutes violations of this Order." *See* FAQ at 7. To date, however, there have been no reports of any indictment or other attempts at prosecution of any landlord for violations of the order.

**Additional considerations.**

The DOJ brief and ensuing FAQ document have now raised new questions pertaining to the tenant protections, posing significant risks of confusion and intimidation that may deter covered persons from invoking the protection of the CDC order. And with just roughly ten weeks remaining before the order expires, the likelihood of securing timely clarification through judicial interpretation appears remote in the large majority of jurisdictions. Rather, the practical meaning and ultimate effect of the CDC order will likely fall into the hands of eviction trial judges far and wide, who will be called upon to interpret and apply the CDC order in conjunction with their own state and local laws. Many such courts may be sympathetic to the claims of landlords, who may not have received rent in some time (though an Eviction Lab study has shown that the median amount of rent claimed in eviction cases filed during Covid-19 was around $1,500, with a significant number of cases filed for less than $500).[11] But those courts should also be made to understand the most important reasons why stopping evictions is critical to the health and well-being of communities:

- *The extent of the mass eviction threat.* As noted above, the threat of mass evictions looms over the entire nation, and courts must be made to understand the magnitude of this threat. In a typical calendar year, about 900,000 judicial evictions take place in the U.S. By comparison, the scope of the Covid-19 eviction crisis could sweep ten, twenty, or even more times as many families out of their homes in just a matter of weeks. The effects of such an eviction tsunami would be devastating—not only on the affected families, but on the neighborhoods, businesses, schools, local governments, and other community institutions where those displacements occur. In many communities, tenants evicted from their homes would wind up homeless in large numbers. Both the U.S. Census Bureau's household pulse survey[12] and the Stout eviction estimator[13] offer quality tools for providing state and local eviction statistics on the magnitude of the mass eviction threat in a particular jurisdiction. Advocates should make sure that courts

---

[11] Renee Louis et al., "Preliminary Analysis: Eviction Claim Amounts During the COVID-19 Pandemic," Eviction Lab (Aug. 27, 2020), https://evictionlab.org/covid-eviction-claims/

[12] https://www.census.gov/data/experimental-data-products/household-pulse-survey.html

[13] https://app.powerbi.com/view?r=eyJrIjoiNzRhYjg2NzAtMGE1MC00NmNjLTllOTMtYjM2NjFmOTA4ZjMyIiwidCl6Ijc5MGJmNjk2LTE3NDYtNGE4OS1hZjI0LTc4ZGE5Y2RhZGE2MSIsImMiOjN9

deciding whether and how to hear and decide eviction cases during the CDC moratorium do so with a clear understanding of just how many households are depending on that protection.

- *The stakes with respect to Covid-19 transmission.* As the CDC's original order makes clear, the danger mass evictions pose to the public health is enormous. *See* 85 Fed.Reg. at 55295-96. The U.S. has never brought Covid-19 under control (as some industrialized countries have managed to do), and case numbers have consistently risen since mid-September:[14]



The CDC issued its order ostensibly as a means of helping tamp down the spread of new Covid cases. *See* 85 Fed.Reg. at 55294 ("In the context of a pandemic, eviction moratoria—like quarantine, isolation, and social distancing—can be an effective public health measure utilized to prevent the spread of communicable disease."). Indeed, data gathered from the pandemic itself already show that eviction moratoria have indeed slowed the spread of Covid-19 in those locations where moratoria have been in effect. A study comparing states that lifted their eviction moratoria to those that did not found, "[a]fter controlling for mask orders, stay at home orders, school closures, and testing rates, as well characteristics of states and underlying time trends," that states lifting eviction moratoriums had 1.5 times higher incidence of Covid-19 and 2.1 times higher mortality rates after eighteen weeks than states that kept eviction moratoria in place.[15] Courts must understand that evictions directly undermine public health efforts, spread Covid-19, and ultimately lead to hospitalizations and deaths.

---

[14] *See* CDC Covid Data Tracker, https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases, last visited Oct. 14, 2020.

[15] Dkt. No. 31-1, Br. of Amici Curiae American Academy of Pediatrics, et al. at 27-28, *Brown v. Azar,* Case No. 20-cv-030702-JPB (N.D.Ga.), *citing* Kathryn M. Leifheit, Sabriya L. Linton, Julia Raifman, Gabriel L. Schwartz,

Emily A. Benfer, Frederick J. Zimmerman & Craig Evan Pollack, Expiring Eviction Moratoriums and COVID-19 Incidence and Mortality (Oct. 2020).

- *The impacts of Covid-19 and the related eviction crisis are being felt most heavily in communities of color.* To date, the U.S. has already seen "more COVID-19 cases, hospitalizations, and deaths in areas where racial and ethnic minority groups live, learn, work, play, and worship."[16] Part of this is due to the overrepresentation if BIPOC workers in occupations posing a higher risk of infection, as well as reduced access to high quality health care. But another key factor is unsafe and unstable housing. Even before Covid-19, Black women—especially mothers—faced eviction at rates substantially higher than any other demographic group and were more likely to live in housing that exposes them to health hazards.[17] This means the impacts of mass evictions will not be spread evenly throughout communities, but are likely to displace families *en masse* from neighborhoods and communities of color and impose great disruptions on the businesses, schools, local government services, and other institutions in those areas.

State courts hearing eviction cases during the pandemic should also understand the heightened importance for tenants to have legal representation. Eviction cases are far more complicated during Covid-19, and unrepresented tenants cannot realistically be expected to understand or properly assert eviction defenses they may have based on the CARES Act, the CDC moratorium, or any state or local eviction restrictions that may exist in addition to whatever other defenses might exist. Failing to ensure tenants' access to counsel under such circumstances presents an exceedingly high risk of erroneous eviction at a time when the importance of safe and decent housing is amplified and the usual governmental interest in fast and efficient eviction proceedings is overshadowed by extraordinary public health imperatives.[18]

---

[16] Danyelle Solomon and Derrick Hamilton, "The Coronavirus Pandemic and the Racial Wealth Gap," Center for American Progress (Mar. 19, 2020), https://www.americanprogress.org/issues/race/news/2020/03/19/481962/coronavirus-pandemic-racial-wealth-gap/; see also CDC, "Health equity considerations and racial and ethnic minority groups" (Jul. 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html (recognizing "increasing evidence that some racial and ethnic minority groups are being disproportionately affected by Covid-19.").

[17] *See, e.g.,* Matthew Desmond, "Poor Black Women Are Evicted at Alarming Rate, Setting Off a Chain of Hardship," MacArthur Foundation How Housing Matters (March 2014), https://www.macfound.org/media/files/HHM_Research_Brief_-_Poor_Black_Women_Are_Evicted_at_Alarming_Rates.pdf

[18] Under *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976), the process due in a particular situation depends on importance of the interest at stake, risk of erroneous deprivation, probable value of additional safeguards, governmental interest, and burdens of additional process. The use of summary proceedings to adjudicate residential eviction cases may fulfill basic federal procedural due process requirements under usual circumstances. *See Lindsey v. Normet,* 405 U.S. 56, 65 (1972). But pandemic conditions alter the procedural due process calculus sigificantly: the need for a safe home in which to quarantine from others and practice good hygiene and social distancing heightens the importance of housing, Covid-related impediments to preparing and presenting defenses amplify the risk of erroneous eviction, and overriding public health considerations militate against the ordinary governmental interest in quickly and efficiently adjudicating the present right of possession.

16

**CENTERS FOR DISEASE CONTROL AND PREVENTION**
**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**ORDER UNDER SECTION 361**
**OF THE PUBLIC HEALTH SERVICE ACT (42 U.S.C. 264)**
**AND 42 CODE OF FEDERAL REGULATIONS 70.2**

**TEMPORARY HALT IN RESIDENTIAL EVICTIONS TO**
**PREVENT THE FURTHER SPREAD OF COVID-19**

SUMMARY

Subject to the limitations under "Applicability," a landlord, owner of a residential property, or other person[1] with a legal right to pursue eviction or possessory action, shall not evict any covered person from any residential property in any jurisdiction to which this Order applies during the effective period of the Order.

DEFINITIONS

"*Available government assistance*" means any governmental rental or housing payment benefits available to the individual or any household member.

"*Available housing*" means any available, unoccupied residential property, or other space for occupancy in any seasonal or temporary housing, that would not violate federal, state, or local occupancy standards and that would not result in an overall increase of housing cost to such individual.

"*Covered person*"[2] means any tenant, lessee, or resident of a residential property who provides to their landlord, the owner of the residential property, or other person with a legal right to pursue eviction or a possessory action,[3] a declaration under penalty of perjury indicating that:

---

[1] For purposes of this Order, "person" includes corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.

[2] This definition is based on factors that are known to contribute to evictions and thus increase the need for individuals to move into close quarters in new congregate or shared living arrangements or experience homelessness. Individuals who suffer job loss, have limited financial resources, are low income, or have high out-of-pocket medical expenses are more likely to be evicted for nonpayment of rent than others not experiencing these factors. See Desmond, M., Gershenson, C., Who gets evicted? Assessing individual, neighborhood, and network factors, *Soc Sci Res*. 2017;62:362-377. doi:10.1016/j.ssresearch.2016.08.017, (identifying job loss as a possible predictor of eviction because renters who lose their jobs experience not only a sudden loss of income but also the loss of predictable future income). According to one survey, over one quarter (26%) of respondents also identified job loss as the primary cause of homelessness. See *2019 San Francisco Homeless Count & Survey Comprehensive Report*, Applied Survey Research, at 22, https://hsh.sfgov.org/wp-content/uploads/2020/01/2019HIRDReport_SanFrancisco_FinalDraft-1.pdf. (last viewed Mar. 24, 2021).

[3] As used throughout this Order, this would include, without limitation, an agent or attorney acting on behalf of the landlord or the owner of the residential property.

(1) The individual has used best efforts to obtain all available government assistance for rent or housing;

(2) The individual either (i) earned no more than $99,000 (or $198,000 if filing jointly) in Calendar Year 2020, or expects to earn no more than $99,000 in annual income for Calendar Year 2021 (or no more than $198,000 if filing a joint tax return),[4] (ii) was not required to report any income in 2020 to the U.S. Internal Revenue Service, or (iii) received an Economic Impact Payment (stimulus check).[5,6]

(3) The individual is unable to pay the full rent or make a full housing payment due to substantial loss of household income, loss of compensable hours of work or wages, a lay-off, or extraordinary[7] out-of-pocket medical expenses;

(4) The individual is using best efforts to make timely partial payments that are as close to the full payment as the individual's circumstances may permit, taking into account other nondiscretionary expenses; and

(5) Eviction would likely render the individual homeless—or force the individual to move into and live in close quarters in a new congregate or shared living setting—because the individual has no other available housing options.

"*Evict*" and "*Eviction*" means any action by a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action, to remove or cause the removal of a covered person from a residential property. This definition also does not prohibit foreclosure on a home mortgage.

---

[4] According to one study, the national two-bedroom housing wage in 2020 was $23.96 per hour (approximately, $49,837 annually), meaning that an hourly wage of $23.96 was needed to afford a modest two-bedroom house without spending more than 30% of one's income on rent. The hourly wage needed in Hawaii (the highest cost U.S. State for rent) was $38.76 (approximately $80,621 annually). See *Out of Reach: How Much do you Need to Earn to Afford a Modest Apartment in Your State?*, National Low Income Housing Coalition, https://reports.nlihc.org/oor (last visited Mar. 23, 2021). As further explained herein, because this Order is intended to serve the critical public health goal of preventing evicted individuals from potentially contributing to the interstate spread of COVID-19 through movement into close quarters in new congregate, shared housing settings, or through homelessness, the higher income thresholds listed here have been determined to better serve this goal.

[5] "Stimulus check" includes payments made pursuant to Section 2201 of the CARES Act, to Section 9601 of the American Rescue Plan Act of 2021, or to any similar federally authorized payments to individual natural persons in 2020 and 2021. Eligibility for the 2020 or 2021 stimulus checks has been based on an income that is equal to or lower than the income thresholds described above and does not change or expand who is a covered person under this Order since it was entered into on September 4, 2020.

[6] A person is likely to qualify for protection under this Order if they receive the following benefits: a) Temporary Assistance for Needy Families (TANF); b) Supplemental Nutrition Assistance Program (SNAP); c) Supplemental Security Income (SSI); or d) Social Security Disability Income (SSDI) to the extent that income limits for these programs are less than or equal to the income limits for this Order. However, it is the individual's responsibility to verify that their income is within the income limits described.

[7] Extraordinary expenses are defined as those that prevented you from paying some or all of your rent or providing for other basic necessities like food security. To qualify as an extraordinary medical expense, the unreimbursed medical expense is one that is likely to exceed 7.5% of one's adjusted gross income for the year.

"*Residential property*" means any property leased for residential purposes, including any house, building, mobile home or land in a mobile home park,[8] or similar dwelling leased for residential purposes, but shall not include any hotel, motel, or other guest house rented to a temporary guest or seasonal tenant as defined under the laws of the state, territorial, tribal, or local jurisdiction.

"*State*" shall have the same definition as under 42 CFR 70.1, meaning "any of the 50 states, plus the District of Columbia."

"*U.S. territory*" shall have the same definition as under 42 CFR 70.1, meaning "any territory (also known as possessions) of the United States, including American Samoa, Guam, the Northern Mariana Islands, the Commonwealth of Puerto Rico, and the U.S. Virgin Islands."

STATEMENT OF INTENT

This Order shall be interpreted and implemented in a manner as to achieve the following objectives:

- Mitigating the spread of COVID-19 within crowded, congregate or shared living settings, or through unsheltered homelessness;
- Mitigating the further spread of COVID-19 from one state or territory into any other state or territory;
- Mitigating the further spread of COVID-19 by temporarily suspending the eviction of covered persons from residential property for nonpayment of rent; and
- Supporting response efforts to COVID-19 at the federal, state, local, territorial, and tribal levels.

BACKGROUND

*COVID-19 IN THE UNITED STATES*

Since January 2020, the respiratory disease known as "COVID-19," caused by a novel coronavirus (SARS-COV-2), has spread globally, including cases reported in all fifty states within the United States, plus the District of Columbia and U.S. territories. As of June 23, 2021, there have been over 179 million cases of COVID-19 globally, resulting in over 3,800,000 deaths.[9] Over 33,300,000 cases have been identified in the United States, with new cases reported daily, and over 599,000 deaths due to the disease.[10]

The virus that causes COVID-19 spreads very easily and sustainably between people, particularly those who are in close contact with one another (within about 6 feet, but occasionally over longer distances), mainly through respiratory droplets produced when an infected person

---

[8] Mobile home parks may also be referred to as manufactured housing communities.
[9] *COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU)*, Johns Hopkins Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html (last updated June 23, 2021).
[10] *COVID Data Tracker*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last updated June 22, 2021).

coughs, sneezes, or talks. Individuals without symptoms can also spread the virus.[11] Among adults, the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. Severe illness means that persons with COVID-19 may require hospitalization, intensive care, or a ventilator to help them breathe, and may be fatal. People of any age with certain underlying medical conditions (e.g. cancer, obesity, serious heart conditions, or diabetes) are at increased risk for severe illness from COVID-19.[12]

COVID-19 vaccines are now widely available in the United States, and all people 12 years and older are recommended to be vaccinated against COVID-19. Three COVID-19 vaccines are currently authorized by the U.S. Food and Drug Administration (FDA) for emergency use: two mRNA vaccines (Pfizer-BioNTech, Moderna) and one viral vector vaccine (Johnson & Johnson/Janssen), each of which has been determined to be safe and effective against COVID-19. As of June 22, 2021, over 150.3 million people in the United States (more than 53% of the population 12 years or older) have been fully immunized.[13] However, as with other transmissible diseases in densely populated congregate settings, the risk for SARS-CoV-2 infection is greater as long as there is continued community transmission of the virus. As vaccination coverage increases, phasing out prevention measures for fully vaccinated people, ideally those measures that are the most disruptive to individuals and society, will be increasingly feasible.[14] However, the vaccination program is still underway; nearly half of the eligible population is not yet fully vaccinated; and children under age 12 are not yet eligible for vaccines. And, although rare, fully vaccinated people may become infected with COVID-19.[15] Moreover, CDC recognizes the risk that even vaccinated people face in densely populated congregate settings. CDC therefore continues to recommend mask use by all people in areas like homeless shelters and other congregate settings.[16]

New variants of SARS-CoV-2 have emerged globally,[17] several of which have been identified as variants of concern.[18] Variants of concern, including the variants Alpha, Beta, Gamma, Delta, and Epsilon, are those for which there is evidence of an increase in transmissibility, more severe

---

[11] Kimball A, Hatfield KM, Arons M, et al. Asymptomatic and Presymptomatic SARS-CoV-2 Infections in Residents of a Long-Term Care Skilled Nursing Facility — King County, Washington, March 2020. MMWR Morb Mortal Wkly Rep 2020;69:377–381. DOI: http://dx.doi.org/10.15585/mmwr.mm6913e1

[12] Razzaghi H, Wang Y, Lu H, et al. Estimated County-Level Prevalence of Selected Underlying Medical Conditions Associated with Increased Risk for Severe COVID-19 Illness — United States, 2018. MMWR Morb Mortal Wkly Rep 2020;69:945–950. DOI: http://dx.doi.org/10.15585/mmwr.mm6929a1.

[13] *COVID-19 Vaccinations in the United States*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#vaccinations (last updated June 22, 2021).

[14] *Interim Public Health Recommendations for Fully Vaccinated People*. Centers for Disease Control and Prevention. https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html (last updated May 28, 2021).

[15] COVID-19 Vaccine Breakthrough Infections Reported to CDC — United States, January 1–April 30, 2021. MMWR Morb Mortal Wkly Rep 2021;70:792–793. DOI: http://dx.doi.org/10.15585/mmwr.mm7021e3

[16] *Interim Guidance for Homeless Service Providers to Plan and Respond to Coronavirus Disease 2019 (COVID-19)*. Centers for Disease Control and Prevention. https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/plan-prepare-respond.html (last updated June 8, 2021).

[17] Abdool Karim SS, de Oliveira T. New SARS-CoV-2 Variants - Clinical, Public Health, and Vaccine Implications [published online ahead of print, 2021 Mar 24]. *N Engl J Med*. 2021;10.1056/NEJMc2100362. doi:10.1056/NEJMc2100362

[18] *Id.*

disease, reduction in neutralization by antibodies generated during previous infection or vaccination, reduced effectiveness of treatments or vaccines, or diagnostic detection failures.[19] The Alpha variant has become the predominant SARS-CoV-2 strain circulating in the United States; however the proportion of Delta variant cases has increased recently.[20] Available evidence suggests the currently authorized mRNA COVID-19 vaccines (Pfizer-BioNTech and Moderna) provide significant protection against known variant strains.[21] Other vaccines, particularly AstraZeneca, show reduced efficacy against infection with certain variants but may still protect against severe disease. Given the predominance of variant strains and the continued emergence of new variants, ongoing monitoring of vaccine effectiveness is needed to identify mutations that could render vaccines most commonly used in the U.S. less effective against more transmissible variants like the Delta variant, which now makes up almost 10 percent of U.S. cases, up from 2.7 percent in May.[22]

In the context of a pandemic, eviction moratoria—like quarantine, isolation, and social distancing—can be an effective public health measure utilized to prevent the spread of communicable disease. Eviction moratoria facilitate self-isolation and self-quarantine by people who become ill or who are at risk of transmitting COVID-19.

Congress passed the Coronavirus Aid, Relief, and Economic Security (CARES) Act (Pub. L. 116-136) to aid individuals and businesses adversely affected by COVID-19 in March 2020. Section 4024 of the CARES Act provided a 120-day moratorium on eviction filings as well as other protections for tenants in certain rental properties with federal assistance or federally related financing. These protections helped alleviate the public health consequences of tenant displacement during the COVID-19 pandemic. The CARES Act eviction moratorium expired on July 24, 2020. The protections in the CARES Act supplemented temporary eviction moratoria and rent freezes implemented by governors and other local officials using emergency powers.

Researchers estimated that this temporary federal moratorium provided relief to a material portion of the nation's roughly 43 million renters.[23] The CARES act also provided funding streams for emergency rental assistance; surveys estimate that this assistance became available to the public through rental assistance programs by July 2020.

The federal moratorium provided by the CARES Act, however, did not reach all renters. Many renters who fell outside the scope of the Federal moratorium were instead protected under state and local moratoria. In early March, 2021, the Census Household Pulse Survey estimated that 6.4

[19] *SARS-CoV-2 Variant Classifications and Definitions*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/variants/variant-info.html#Concern (last updated June 22, 2021).
[20] *Id.*
[21] *Science Brief: COVID-19 Vaccines and Vaccination*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html (last updated May 27, 2021).
[22] According to data with an end collection date of June 5, 2021. *Variant Proportions*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last updated June 22, 2021).
[23] Laurie Goodman, Karan Kaul, and Michael Neal. *The CARES Act Eviction Moratorium Covers All Federally Financed Rentals—That's One in Four US Rental Units*. The Urban Institute. April 2, 2020. https://www.urban.org/urban-wire/cares-act-eviction-moratorium-covers-all-federally-financed-rentals-thats-one-four-us-rental-units

million households were behind on rent, and just under half fear imminent eviction.[24] In 2016, research showed that there were 3.6 million eviction filings and 1.5 million eviction judgments over the span of a whole year,[25] meaning that a wave of evictions on the scale feared by households would be unprecedented in modern times. A large portion of those who are evicted may move into close quarters in shared housing or, as discussed below, become homeless, thus becoming at higher risk of COVID-19.

On September 4, 2020, the CDC Director issued an Order temporarily halting evictions in the United States for the reasons described therein. That Order was set to expire on December 31, 2020, subject to further extension, modification, or rescission. Section 502 of Title V, Division N of the Consolidated Appropriations Act, 2021 extended the Order until January 31, 2021, and approved the Order as an exercise of the CDC's authority under Section 361 of the Public Health Service Act (42 U.S.C. 264). With the extension of the Order, Congress also provided $25 billion for emergency rental assistance for the payment of rent and rental arrears. Congress later provided an additional $21.55 billion in emergency rental assistance when it passed the American Rescue Plan.

On January 29, 2021, following an assessment of the ongoing pandemic, the CDC Director renewed the Order until March 31, 2021. On March 28, 2021, the CDC Director modified and extended the Order until June 30, 2021.This Order further extends the prior Eviction Moratoria for what is currently intended to be a final 30 day-period, until July 31, 2021, for the reasons described herein. Although this Order is subject to revision based on the changing public health landscape, absent an unexpected change in the trajectory of the pandemic, CDC does not plan to extend the Order further. To the extent any provision of this Order conflicts with prior Orders, this Order is controlling.

Researchers estimate that, in 2020, Federal, state, and local eviction moratoria led to over one million fewer evictions than the previous year.[26] Additional research shows that, despite the CDC eviction moratorium leading to an estimated 50% decrease in eviction filings compared to the historical average, there have still been over 100,000 eviction filings since September just within approximately 35 cities and states with more readily available data, suggesting high demand and likelihood of mass evictions.[27]

*EVICTION, CROWDING, AND INTERSTATE TRANSMISSION OF COVID-19*

By February 10, 2021, the U.S. Department of the Treasury had paid all of the $25 billion made available by the Consolidated Appropriations Act of 2021 to states, territories, localities and

---

[24] *Census Household Pulse Survey: Key Phase 3 Housing Payment Findings.* Office of Policy Development and Research, HUDUser (April 26, 2021). https://www.huduser.gov/portal/pdredge/pdr-edge-trending-042621.html
[25] Ashley Gromis. *Eviction: Intersection of Poverty, Inequality, and Housing.* Eviction Lab, Princeton University (May 2019). https://www.un.org/development/desa/dspd/wp-content/uploads/sites/22/2019/05/GROMIS_Ashley_Paper.pdf
[26] Hepburn P, Louis R, Fish J, et al. U.S. Eviction Filing Patterns in 2020. Socius. January 2021. doi:10.1177/23780231211009983.
[27] Peter Hepburn and Renee Louis. *Preliminary Analysis: Six Months of the CDC Eviction Moratorium* (March 8, 2021). https://evictionlab.org/six-months-cdc/

tribes for the purpose of providing emergency rental assistance to eligible households in their jurisdictions. Additionally, as directed in the Act, Treasury has also made available 40 percent— more than $8.6 billion—of the additional funding to states, territories and localities for emergency rental assistance provided in the American Rescue Plan. Based on data collected from grantees, Treasury reports that over 630,000 households had already applied for emergency rental assistance by the end of March—when many state and local programs had not yet opened for applications. Though there are indications that emergency rental assistance has started to reach increasing numbers of families over recent months, state and local agencies likely have hundreds of thousands of applications for assistance that currently remain outstanding as programs accelerate their activity. According to Treasury, more households—over 96,000—were served in April than in the entire first quarter. Assistance accelerated in May, with over a fifty percent increase in households served compared to the previous month. The level of assistance provided to low income households is expected to continue increasing because some states started accepting rental assistance applications in late May, including as late as June 1 and now all states are operating programs. Based on analysis of grantee reporting, Treasury believes that state and local emergency rental assistance programs will collectively deploy more rental assistance in July than in any previous month. In addition to Emergency Rental Assistance, there are coordinated efforts across federal agencies to – in partnership with states and localities – promote eviction prevention strategies.

An unprecedented and avoidable surge of evictions is likely to occur if the national moratorium were to conclude on June 30. Recent data from the U.S. Census Household Pulse Survey demonstrates that an increased percentage of households behind on rent believe that an eviction is likely in the next two months.[28] A surge in evictions could lead to the immediate and significant movement of large numbers of persons from lower density to higher density housing. This potential for a mass movement of persons would occur at precisely the same time that our nation is actively engaged in a widespread vaccination effort. This vaccination effort has a slower rate of penetration among the populations most likely to experience eviction, and such a mass movement would place increased stress on the homeless service system.[29] In combination with the continued underlying COVID-19 spread, and the overlapping factors described above, this would create considerable risk for rapid transmission of COVID-19 in high risk settings. Allowing additional time for rent relief to reach renters and to further increase vaccination rates through the end of July 2021 could decrease the numbers of likely evictions and avert the potential of COVID-19 resurgence among people who experience eviction, their communities, and other regions of the country affected by the resulting transmission.

Evicted renters must move, which leads to multiple outcomes that increase the risk of COVID-19 spread. Specifically, many evicted renters move into close quarters in shared housing or other congregate settings. These moves may require crossing state borders. According to the Census

---

[28] Household Pulse Survey Interactive Tool. U.S. Census Bureau. https://www.census.gov/data-tools/demo/hhp/#/ (last visited June 23, 2021).
[29] Barry V, Dasgupta S, Weller DL, et al. Patterns in COVID-19 Vaccination Coverage, by Social Vulnerability and Urbanicity — United States, December 14, 2020–May 1, 2021. MMWR Morb Mortal Wkly Rep 2021;70:818–824. DOI: http://dx.doi.org/10.15585/mmwr.mm7022e1

Bureau American Housing Survey, 32% of renters reported that they would move in with friends or family members upon eviction, which would introduce new household members and potentially increase household crowding. Studies show that COVID-19 transmission occurs readily within households. The secondary attack rate in households has been estimated to be 17%, and household contacts are estimated to be 6 times more likely to become infected by an index case of COVID-19 than other close contacts.[30] A study of pregnant women in New York City showed that women in large households (greater number of residents per household) were three times as likely to test positive for SARS-CoV-2 than those in smaller households, and those in neighborhoods with greater household crowding (>1 resident per room) were twice as likely to test positive.[31] Throughout the United States, counties with the highest proportion of crowded households have experienced COVID-19 mortality rates 2.6 times those of counties with the lowest proportion of crowded households.

Shared housing is not limited to friends and family. It includes a broad range of settings, including transitional housing and domestic violence and abuse shelters. Special considerations exist for such housing because of the challenges of maintaining social distance. Residents often gather closely or use shared equipment, such as kitchen appliances, laundry facilities, stairwells, and elevators. Residents may have unique needs, such as disabilities, chronic health conditions, cognitive decline, or limited access to technology, and thus may find it more difficult to take actions to protect themselves from COVID-19. CDC recommends that shelters provide new residents with a clean mask, keep them isolated from others, screen for symptoms at entry, or arrange for medical evaluations as needed depending on symptoms. Accordingly, an influx of new residents at facilities that offer support services could potentially overwhelm staff and, if recommendations are not followed, lead to exposures.

Modeling studies and preliminary observational data from the pre-vaccine phase of the COVID-19 pandemic comparing incidence between states that implemented and lifted eviction moratoria indicate that evictions substantially contribute to COVID-19 transmission. In mathematical models where eviction led exclusively to sharing housing with friends or family, lifting eviction moratoria led to a 30% increased risk of contracting COVID-19 among people who were evicted and those with whom they shared housing after eviction.[32] Compared to a scenario where no evictions occurred, the models also predicted a 4%-40% increased risk of infection, even for those who did not share housing, as a result of increased overall transmission. The authors estimated that anywhere from 1,000 to 100,000 excess cases per million population could be attributable to evictions depending on the eviction and infection rates.

[30] Qin-Long Jing, et al. Household secondary attack rate of COVID-19 and associated determinants in Guangzhou, China: a retrospective cohort study. The Lancet.2020 June 17; vol. 20.10; doi: https://doi.org/10.1016/S1473-3099(20)30471-0.

[31] Ukachi N. Emeruwa, et al. Associations Between Built Environment, Neighborhood Socioeconomic Status, and SARS-CoV-2 Infection Among Pregnant Women in New York City. JAMA. 2020;324(4):390-392. doi:10.1001/jama.2020.11370.

[32] Nande A, Sheen J, Walters EL, Klein B, Chinazzi M, Gheorghe AH, Adlam B, Shinnick J, Tejeda MF, Scarpino SV, Vespignani A, Greenlee AJ, Schneider D, Levy MZ, Hill AL. The effect of eviction moratoria on the transmission of SARS-CoV-2. Nat Commun. 2021 Apr 15;12(1):2274. doi: 10.1038/s41467-021-22521-5. PMID: 33859196; PMCID: PMC8050248.

An analysis of observational data from state-based eviction moratoria in 43 states and the District of Columbia showed significant increases in COVID-19 incidence and mortality approximately 2-3 months after eviction moratoria were lifted (pre-peer review). Specifically, the authors compared the COVID-19 incidence and mortality rates in states that lifted their moratoria with the rates in states that maintained their moratoria. In these models, the authors accounted for time-varying indicators of each state's test count as well as major public-health interventions including lifting stay-at-home orders, school closures, and mask mandates. After adjusting for these other changes, they found that the incidence of COVID-19 in states that lifted their moratoria was 1.6 times that of states that did not at 10 weeks post-lifting (95% CI 1.0, 2.3), a ratio that grew to 2.1 at ≥16 weeks (CI 1.1, 3.9). Similarly, they found that mortality in states that lifted their moratoria was 1.6 times that of states that did not at 7 weeks post-lifting (CI 1.2, 2.3), a ratio that grew to 5.4 at ≥16 weeks (CI 3.1, 9.3). The authors estimated that, nationally, over 433,000 cases of COVID-19 and over 10,000 deaths could be attributed to lifting state moratoria.[33]

Although data are limited, available evidence suggests evictions lead to interstate spread of COVID-19 in two ways. First, an eviction may lead the evicted members of a household to move across state lines. Of the 35 million people in America who move each year, 15% move to a new state. Second, even if a particular eviction, standing alone, would not always result in interstate displacement, the mass evictions that would occur in the absence of this Order would inevitably increase the interstate spread of COVID-19. This Order cannot effectively mitigate interstate transmission of COVID-19 without covering intrastate evictions (evictions occurring within the boundaries of a state or territory), as the level of spread of SARS-CoV-2 resulting from these evictions can lead to SARS-CoV-2 transmission across state borders.

Moreover, intrastate spread facilitates interstate spread in the context of communicable disease spread, given the nature of infectious disease. In the aggregate, the mass-scale evictions that will likely occur in the absence of this Order will inevitably increase interstate spread of COVID-19.

*EVICTION, HOMELESSNESS, AND COVID-19 TRANSMISSION*

Evicted individuals without access to support or other assistance options may become homeless, including older adults or those with underlying medical conditions, who are more at risk for severe illness from COVID-19 than the general population. In Seattle-King County, 5-15% of people experiencing homelessness between 2018 and 2020 cited eviction as the primary reason for becoming homeless.[34] Additionally, some individuals and families who are evicted may originally stay with family or friends, but subsequently seek homeless services. Data collection

---

[33] Leifheit, Kathryn M. and Linton, Sabriya L. and Raifman, Julia and Schwartz, Gabriel and Benfer, Emily and Zimmerman, Frederick J and Pollack, Craig, Expiring Eviction Moratoriums and COVID-19 Incidence and Mortality (November 30, 2020). Available at SSRN:
https://ssrn.com/abstract=3739576 or http://dx.doi.org/10.2139/ssrn.3739576.
[34] *Count Us In 2020.* KCRHA (July 2020). https://kcrha.org/wp-content/uploads/2020/07/Count-Us_In-2020-Final_7.29.2020.pdf

by an emergency shelter in Columbus, Ohio, showed that 35.4% of families and 11.4% of single adults reported an eviction as the primary or secondary reason for their seeking shelter. [35]

Extensive outbreaks of COVID-19 have been identified in homeless shelters. In Seattle, Washington, a network of three related homeless shelters experienced an outbreak that led to 43 cases among residents and staff members. In Boston, Massachusetts, universal COVID-19 testing at a single shelter revealed 147 cases, representing 36% of shelter residents. COVID-19 testing in a single shelter in San Francisco led to the identification of 101 cases (67% of those tested). Data from 557 universal diagnostic testing events at homeless shelters in 21 states show an average of 6% positivity among shelter clients. Data comparing the incidence or severity of COVID-19 among people experiencing homelessness directly to the general population are limited. However, during the 15-day period of the outbreak in Boston, MA, researchers estimated a cumulative incidence of 46.3 cases of COVID-19 per 1000 persons experiencing homelessness, as compared to 1.9 cases per 1000 among Massachusetts adults (pre-print).

CDC guidance recommends increasing physical distance between beds in homeless shelters, which is likely to decrease capacity, while community transmission of COVID-19 is occurring. These guidelines are similar to other guidance issued for other congregate settings such as prisons and jails. To adhere to this guidance, shelters have limited the number of people served throughout the United States. In many places, considerably fewer beds are available to individuals who become homeless. Shelters that do not adhere to the guidance, and operate at ordinary or increased occupancy, are at greater risk for the types of outbreaks described above. The challenge of mitigating disease transmission in homeless shelters has been compounded because some organizations have chosen to stop or limit volunteer access and participation.

*PERSONS AT HIGHER RISK OF EVICTION MAY ALSO BE AT HIGHER RISK OF BEING UNVACCINATED*

At this time, communities with high rates of eviction may currently have lower coverage of COVID-19 vaccination – a focus for current vaccination campaigns. In the spring of 2021, counties with high social vulnerability (i.e., social and structural factors associated with adverse health outcome inclusive of socioeconomic indicators related to risk of eviction) were shown to have lower levels of COVID-19 vaccination.[36]

CDC EVICTION MORATORIUM

The Department of the Treasury continues to distribute emergency rental assistance funds that may help mitigate spikes in COVID-19 transmission due to increases in evictions. These funds are expected to make a meaningful difference for hundreds of thousands of people who are

---

[35] Chester Hartman and David Robinson. "Evictions: The Hidden Housing Problem" in *Housing Policy Debate*. 2003.

[36] Barry V, Dasgupta S, Weller DL, Kriss JL, Cadwell BL, Rose C, Pingali C, Musial T, Sharpe JD, Flores SA, Greenlund KJ, Patel A, Stewart A, Qualters JR, Harris L, Barbour KE, Black CL. Patterns in COVID-19 Vaccination Coverage, by Social Vulnerability and Urbanicity - United States, December 14, 2020-May 1, 2021. MMWR Morb Mortal Wkly Rep. 2021 Jun 4;70(22):818-824. doi: 10.15585/mmwr.mm7022e1. PMID: 34081685; PMCID: PMC8174677.

expected to receive the rental assistance in the 30-day horizon of this Order, alongside other federal and state efforts to prevent evictions.[37]

On September 4, 2020, the CDC Director issued an Order temporarily halting evictions in the United States for the reasons described therein. That Order was set to expire on December 31, 2020, subject to further extension, modification, or rescission. Section 502 of Title V, Division N of the Consolidated Appropriations Act, 2021 extended the Order until January 31, 2021. With the extension of the Order, Congress also provided $25 billion for emergency rental assistance for the payment of rent and rental arrears. Congress later provided an additional $21.55 billion in emergency rental assistance when it passed the American Rescue Plan.

On January 29, 2021, following an assessment of the ongoing pandemic, the CDC Director renewed the Order until March 31, 2021. On March 28, the CDC Director renewed the Order until June 30, 2021. This Order further extends the prior Eviction Moratorium until July 31, 2021, for the reasons described herein, while the Department of the Treasury disburses the remaining ERA funds to state and local jurisdictions, and those grantees continue to accelerate efforts to deploy rental assistance on behalf of tenants. To the extent any provision of this Order conflicts with prior Orders, this Order is controlling.

## APPLICABILITY

This Order does not apply in any state, local, territorial, or tribal area with a moratorium on residential evictions that provides the same or greater level of public-health protection than the requirements listed in this Order or to the extent its application is prohibited by federal court order. In accordance with 42 U.S.C. 264(e), this Order does not preclude state, local, territorial, and tribal authorities from imposing additional requirements that provide greater public-health protection and are more restrictive than the requirements in this Order.

This Order is a temporary eviction moratorium to prevent the further spread of COVID-19. This Order does not relieve any individual of any obligation to pay rent, make a housing payment, or comply with any other obligation that the individual may have under a tenancy, lease, or similar contract. Nothing in this Order precludes the charging or collecting of fees, penalties, or interest as a result of the failure to pay rent or other housing payment on a timely basis, under the terms of any applicable contract.

Nothing in this Order precludes evictions based on a tenant, lessee, or resident: (1) Engaging in criminal activity while on the premises; (2) threatening the health or safety of other residents;[38] (3) damaging or posing an immediate and significant risk of damage to property; (4) violating any applicable building code, health ordinance, or similar regulation relating to health and safety;

---

[37] *Treasury Emergency Rental Assistance Programs in 2021: Analysis of a National Survey.* National Low Income Housing Coalition. June 2021. https://nlihc.org/sites/default/files/HIP_NLIHC_Furman_2021_6-22_FINAL_v2.pdf
[38] Individuals who might have COVID-19 are advised to stay home except to get medical care. Accordingly, individuals who might have COVID-19 and take reasonable precautions to not spread the disease should not be evicted on the ground that they may pose a health or safety threat to other residents. See *What to Do if You are Sick*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html (last updated Mar. 17, 2021).

or (5) violating any other contractual obligation, other than the timely payment of rent or similar housing-related payment (including non-payment or late payment of fees, penalties, or interest).

Any evictions for nonpayment of rent initiated prior to September 4, 2020, but not yet completed, are subject to this Order. Any tenant, lessee, or resident of a residential property who qualifies as a "Covered Person" and is still present in a rental unit is entitled to protections under this Order. Any eviction that was completed prior to September 4, 2020, is not subject to this Order.

Under this Order, covered persons may be evicted for engaging in criminal activity while on the premises. But covered persons may not be evicted on the sole basis that they are alleged to have committed the crime of trespass (or similar state-law offense) where the underlying activity is a covered person remaining in a residential property for nonpayment of rent. Permitting such evictions would result in substantially more evictions overall, thus increasing the risk of disease transmission as otherwise covered persons move into congregate settings or experience homelessness. This result would be contrary to the stated objectives of this Order, and therefore would diminish their effectiveness. Moreover, to the extent such criminal trespass laws are invoked to establish criminal activity solely based on a tenant, lessee, or resident of a residential property remaining in a residential property despite the nonpayment of rent, such invocation conflicts with this Order and is preempted pursuant to 42 U.S.C. 264(e).

Individuals who are confirmed to have, who have been exposed to, or who might have COVID-19 and take reasonable precautions to not spread the disease may not be evicted on grounds that they may pose a health or safety threat to other residents.

The Order is extended through July 31, 2021, based on the current and projected epidemiological context of SARS-CoV-2 transmission throughout the United States. This 30-day extension, intended to be the final iteration, will allow the assessment of natural changes to COVID-19 incidence, the influences of new variants, additional distribution of emergency rental assistance funds, and the expansion of COVID-19 vaccine uptake.

DECLARATION FORMS

To qualify for the protections of this Order, a tenant, lessee, or resident of a residential property must provide a completed and signed copy of a declaration with the elements listed in the definition of "Covered person" to their landlord, owner of the residential property where they live, or other person who has a right to have them evicted or removed from where they live. To assist tenants and landlords, the CDC created a standardized declaration form that can be downloaded here: https://www.cdc.gov/coronavirus/2019-ncov/downloads/declaration-form.pdf.

Tenants, lessees, and residents of residential property are not obligated to use the CDC form. Any written document that an eligible tenant, lessee, or residents of residential property presents to their landlord will comply with this Order, as long as it contains the required elements of "Covered person" as described in this Order. In addition, tenants, lessees, and residents of residential property are allowed to declare in writing that they meet the elements of covered person in other languages.

All declarations, regardless of form used, must be signed, and must include a statement that the tenant, lessee, or resident of a residential property understands that they could be liable for perjury for any false or misleading statements or omissions in the declaration. This Order does not preclude a landlord challenging the truthfulness of a tenant's, lessee's, or resident's declaration in court, as permitted under state or local law.

In certain circumstances, such as individuals filing a joint tax return, it may be appropriate for one member of the residence to provide an executed declaration on behalf of the other adult residents party to the lease, rental agreement, or housing contract. The declaration may be signed and transmitted either electronically or by hard copy.

As long as the information in a previously signed declaration submitted under a previous order remains truthful and accurate, covered persons do not need to submit a new declaration under this Order.

FINDINGS AND ACTION

*DETERMINATION*

For the reasons described herein, I am extending the September 4, 2020 Order, as extended by section 502 of Title V, Division N of the Consolidated Appropriations Act, 2021 and further extended and modified by the January 29, 2021 and March 28, 2021 Orders. I have determined based on the information below that extending the temporary halt in evictions in this Order constitutes a reasonably necessary measure under 42 CFR 70.2 to prevent the further spread of COVID-19 throughout the United States. I have further determined that measures by states, localities, or territories that do not meet or exceed these minimum protections are insufficient to prevent the interstate spread of COVID-19.

State and local jurisdictions continue to distribute emergency rental assistance funds, provided by the Department of Treasury, that will help avert a spate of evictions and thus mitigate corresponding spikes in COVID-19 transmission. Although trends have improved dramatically since January 2021, there continues to be ongoing transmission of approximately 10,000 cases per day in the United States.[39]

Congress has appropriated approximately $46 billion—of which almost three-quarters is currently available to state and local grantees—to help pay rent and rental arrears for tenants who may otherwise be at high risk of eviction. According to estimates based on the U.S. Census Household Pulse Survey, approximately 6.4 million renter households are behind on their rent as of March 29, 2021. The successful delivery of those funds by states and localities should greatly reduce the incidence of eviction that would occur in the absence of that support. However, many states and localities are still ramping up the collection and processing of applications and the delivery of assistance and putting in place other eviction prevention strategies. It was only in the beginning of June that all state-run emergency rental assistance programs had opened for applications. If the moratorium expires on June 30, a wave of evictions, on the order of hundreds

---

[39] COVID Data Tracker, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases (last updated June 22, 2021).

of thousands, could occur this summer and early fall, exacerbating the spread of COVID-19 among the significant percentage of the population that remains unvaccinated. In appropriating these emergency rental assistance funds, Congress intended that the funding would work in concert with the eviction moratorium, providing time for rental assistance to reach eligible tenants and landlords to sustainably reduce the threat of an eviction wave after an eviction moratorium was no longer in effect. While the pace of assistance is continuing to increase, without additional time for states and localities to deliver this needed relief and engage in other efforts to prevent evictions, a surge of evictions would occur upon the conclusion of the national moratorium. A surge in evictions would lead to immediate movement, crowding, and increased stress on the homeless service system. In combination with ongoing COVID-19 transmission, and the overlapping factors described above, this would create considerable risk for the rapid transmission of COVID-19 in high-risk settings. Allowing additional time for rent relief to reach renters – alongside other Federal and state actions to prevent evictions – by an extension through the month of July 2021 can decrease the numbers of likely evictions and avert the potential of COVID-19 resurgence among people who experience eviction, their communities, and other regions of the country affected by the resulting transmission.

Based on the convergence of these issues, I have determined that extending the temporary halt on evictions is appropriate.

Therefore, under 42 CFR 70.2, subject to the limitations under the "Applicability" section, the September 4, 2020 Order, as extended and modified by the January 29, 2021 and March 28, 2021 Orders, is hereby extended through July 31, 2021.

Accordingly, a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action shall not evict any covered person from any residential property in any state or U.S. territory where there are documented cases of COVID-19 and the state or U.S. territory has provided a level of public-health protections below the requirements listed in this Order.

This Order is not a rule within the meaning of the Administrative Procedure Act (APA) but rather an emergency action taken under the existing authority of 42 C.F.R § 70.2. The purpose of section 70.2, which was promulgated through notice-and-comment rulemaking, is to enable CDC to take swift steps to prevent contagion without having to seek a second round of public comments and without a delay in effective date.[40]

### GOOD CAUSE

In the event this Order qualifies as a rule under the APA, there is good cause to dispense with prior public notice and comment and a delay in effective date. See 5 U.S.C. 553(b)(B), (d)(3). Good cause exists, in sum, because the public health emergency caused by the COVID-19 pandemic and the unpredictability of the trajectory of the pandemic make it impracticable and contrary to the public health, and by extension the public interest, to delay the issuance and effective date of this Order.

---

[40] *Chambless Enters., LLC v. Redfield*, No. 20-1455, 2020 WL 7588849 (W.D. La. 2020).

In the September 4, 2020 Order, the previous CDC Director determined that good cause existed because the public health emergency caused by COVID-19 made it impracticable and contrary to the public health, and by extension the public interest, to delay the issuance and effective date of the Order. The previous Director also found that a delay in the effective date of the Order would permit the occurrence of evictions—potentially on a mass scale—that would have potentially significant consequences. For these reasons, the previous Director concluded that the delay in the effective date of the Order would defeat the purpose of the Order and endanger the public health and, therefore, determined that immediate action was necessary. As a result, the previous Director issued the Order without prior notice and comment and without a delay in the effective date. I made similar findings in the January 29, 2021 and March 28, 2021 Orders, and similar findings, as described herein, continue to exist.

The rapidly changing nature of the pandemic requires not only that CDC act swiftly, but also deftly to ensure that its actions are commensurate with the threat. This necessarily involves assessing evolving conditions that inform CDC's determinations. And although the pandemic is showing positive trends, the fundamental public health threat that existed on September 4, 2020, January 29, 2021, and March 28, 2021—the risk of large numbers of residential evictions contributing to the spread of COVID-19 throughout the United States—continues to exist. Without this Order, there is every reason to expect that evictions will increase. It is imperative that public health authorities act quickly to mitigate such an increase of evictions, which could increase the likelihood of new spikes in SARS-CoV-2 transmission even as COVID-19 morbidity and mortality may be waning. Such mass evictions and the attendant public-health consequences could unravel positive trends, and would be very difficult to reverse.

For all of these reasons, I hereby conclude that immediate action is again necessary and that notice-and-comment rulemaking and a delay in effective date would be impracticable and contrary to the public interest.

*MISCELLANEOUS*

Similarly, if this Order qualifies as a rule under the APA, the Office of Information and Regulatory Affairs (OIRA) has determined that it would be an economically significant regulatory action pursuant to Executive Order 12866 and a major rule under Subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996 (the Congressional Review Act or CRA), 5 U.S.C. 804(2). Thus, this action has been reviewed by OIRA. CDC has determined that for the same reasons given above, there would be good cause under the CRA to make the requirements herein effective immediately. 5 U.S.C. 808(2).

If any provision of this Order, or the application of any provision to any persons, entities, or circumstances, shall be held invalid, the remainder of the provisions, or the application of such provisions to any persons, entities, or circumstances other than those to which it is held invalid, shall remain valid and in effect.

This Order shall be enforced by federal authorities and cooperating state and local authorities through the provisions of 18 U.S.C. 3559, 3571; 42 U.S.C. 243, 268, 271; and 42 CFR 70.18. However, this Order has no effect on the contractual obligations of renters to pay rent and shall

mortgages backed by the federal government provide many landlords, especially smaller landlords, with temporary relief as new emergency rental assistance programs are deployed.

Treasury, HUD, and USDA grantees and partners play a critical role in prioritizing efforts to support this goal. All communities should assess what resources have already been allocated to prevent evictions and homelessness through temporary rental assistance and homelessness prevention, particularly to the most vulnerable households.

Treasury, HUD, and USDA stand at the ready to support American communities in taking these steps to reduce the spread of COVID-19 and maintain economic prosperity.

For program support, including technical assistance, please visit www.hudexchange.info/program-support. For further information on HUD resources, tools, and guidance available to respond to the COVID-19 pandemic, state and local officials are directed to visit https://www.hud.gov/coronavirus. These tools include toolkits for Public Housing Authorities and Housing Choice Voucher landlords related to housing stability and eviction prevention, as well as similar guidance for owners and renters in HUD-assisted multifamily properties. Furthermore, tenants can visit consumerfinance.gov/housing for up-to-date information on rent relief options, protections, and key deadlines.

EFFECTIVE DATE

This Order is effective on July 1, 2021, and will remain in effect through July 31, 2021, subject to revision based on the changing public health landscape.

In testimony whereof, the Director, Centers for Disease Control and Prevention, U.S. Department of Health and Human Services, has hereunto set her hand at Atlanta, Georgia, this 24th day of June 2021.

Rochelle P. Walensky, MD, MPH
Director,
Centers for Disease Control and Prevention